Ann **KLEIN**, Commissioner, New Jersey Department of Institutions and Agencies, Margaret Heeschen, Thomas Grant and Maurice Mizell, Individually and on behalf of all others similarly situated, Shore Manor, Ltd., Intervenor,

v.

Joseph A. **CALIFANO**, Jr., Secretary, Department of Health, Education and Welfare, and William Toby, Acting Commissioner, Region II, Social and Rehabilitative Service, Dept. of Health, Education and Welfare, Appellants.

No. 77–1896.

United States Court of Appeals, Third Circuit.

Argued Feb. 21, 1978.

Resubmitted En Banc July 10, 1978.

Decided Sept. 29, 1978.

Adams, Circuit Judge, filed concurring statement.

Seitz, Chief Judge, dissented in part and filed opinion in which Rosenn and James Hunter, III, Circuit Judges, joined.

Garth, Circuit Judge, dissented and filed opinion.

Barbara Allen Babcock, Asst. Atty. Gen., William Kanter, Robert E. Kopp, and Peter Bouxsein, Attys., Civ. Div. App. Section, Dept. of Justice, Washington, D. C., Jonathan L. Goldstein, U. S. Atty., Newark, N. J., for appellants.

Stanley C. Van Ness, Public Advocate of the State of New Jersey, Arthur Penn, Director, Div. of Public Interest Advocacy, Robert D. Westreich, Asst. Deputy Public Advocate, Trenton, N. J., for appellee-class plaintiffs.

Patrick T. McGahn, Jr., McGahn & Friss, Atlantic City, N. J., for intervenor.

Argued Feb. 21, 1978.

Before ALDISERT, VAN DUSEN and WEIS, Circuit Judges.

Resubmitted En Banc July 10, 1978.

Before SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS, GARTH and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This case arises from a threatened termination by the Department of Health, Education & Welfare of federal Medicaid funding for Shore Manor Nursing Home because the facility did not comply with federal quality standards. The termination of federal funding would have forced the transfer of the Medicaid patients residing at Shore Manor to other available facilities which qualified as Medicaid providers. HEW refused to provide the patients a pretermination evidentiary hearing on Shore Manor's qualification for continued participation in Medicaid. Several residents and the commissioner of the state Medicaid agency filed

a class action on behalf of all Shore Manor Medicaid patients seeking to enjoin termination of Medicaid funding for Shore Manor and to compel HEW to conduct evidentiary hearings. The district court initially granted a preliminary injunction but later dissolved it. The district court then conducted further proceedings after which it granted summary judgment on one count of the class action plaintiffs' complaint. The court's order enjoined HEW from terminating federal funding unless the Shore Manor residents were first afforded a pretermination evidentiary hearing. HEW appealed from the district court's order.

Subsequent to the district court's order, Shore Manor rectified conditions and was recertified by the state Medicaid agency as a qualified Medicaid provider for the period January 31, 1978, to July 31, 1978. This recertification has dispelled the threat of a cut-off of federal funding and obviated the transfer of Medicaid patients from Shore Manor. These events pose the issue of mootness. We conclude that HEW's appeal is moot as regards prospective application of the district court's injunction. However, the appeal is not moot as concerns HEW's intention to seek recoupment from the State of New Jersey for past expenditures in compliance with what it asserts to be a wrongfully granted injunction. We find no merit in HEW's contention that the district court erroneously compelled federal funding for Shore Manor until the residents were given a pretermination hearing. Accordingly, HEW is not entitled to recoupment of its expenditures in compliance with the district court's injunction. We therefore remand the case to the district court, with directions to dismiss the action as moot, subject, however, to our determination that paragraph (2) of the April 1, 1977, district court order, *see* note 4 *infra*, was proper in its holding that a hearing for the class plaintiffs was required.

## I.

A brief summary of the Medicaid program will put in context the Shore Manor residents' claim of a right to an evidentiary hearing prior to termination of federal funds for the Home. Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, established Medicaid, a cooperative, jointly funded, federal-state program to financially assist low income persons in securing medical care. Under Medicaid, HEW prescribes medical care delivery standards but state agencies administer eligibility requirements and distribute federal grant money to individual recipients. An individual determined by the state to be eligible for Medicaid benefits may obtain recompensable care from any institution, agency or person qualified to provide the relevant medical services. 42 U.S.C. § 1396a(a)(23). A state may not terminate, suspend or reduce an individual's benefits without providing notice and a hearing. 45 C.F.R. § 205.10(a)(5). Nursing home facilities must comply with statutory quality requirements and implementing federal regulations in order to qualify as a Medicaid provider. 42 U.S.C. §§ 1396a(a)(28), 1395x(j); 20 C.F.R. §§ 405.1101, *et seq.* The state is primarily responsible for determining whether Medicaid providers comply with the federal standards. 42 U.S.C. § 1396a(a)(33). If found qualified, a Medicaid provider may receive payments from the state for its Medicaid eligible patients.

Between January 1, 1975, and April 1976, repeated state health inspections revealed that Shore Manor did not comply in substantial respects with federal quality standards.[1] Effective June 1975, HEW revoked Shore Manor's certification for participation in the Medicare program. HEW did not similarly disqualify the Home from Medicaid, purportedly because the Medicaid patients residing there could not then be promptly relocated due to a shortage of beds in other qualified facilities. In May 1976, HEW notified New Jersey's Medicaid

---

1. Shore Manor did not comply with several nursing care, dietary, housekeeping, and administrative standards. The facility was, however, structurally sound and conformed to life safety requirements. *See* Deposition of David A. Wagner, Deputy Commissioner in New Jersey Department of Health (35–38a).

agency that because of Shore Manor's noncompliance with federal requirements, federal Medicaid funding for patients at the Home would be terminated effective June 16, 1976.[2] On June 8, 1976, the New Jersey Department of the Public Advocate wrote HEW on behalf of the Shore Manor Medicaid patients, requesting an evidentiary hearing for the patients prior to suspension of funding. HEW responded that the patients were not entitled to a hearing because disqualification of Shore Manor would not reduce their Medicaid benefits insomuch as the state would be required to transfer the patients to qualified facilities. Denied their hearing, the residents of Shore Manor filed this class action, asserting in the fourth count of their complaint an entitlement to a pretermination HEW hearing under the due process clause of the Fifth Amendment.

On June 28, 1976, the district court granted a preliminary injunction forestalling suspension of federal funding for Shore Manor until September 1, 1976, after which time the court would consider modification of its order were Shore Manor still not in compliance with federal standards. On timely motion by HEW, the district court determined that Shore Manor remained in noncompliance and, therefore, dissolved its preliminary injunction as of October 14, 1976. By accompanying order, HEW was required to continue federal funding for 30 days from October 14, 1976, pursuant to federal regulations. *See* 45 C.F.R. § 249.-10(b)(4)(i)(c). Federal financial participation was terminated November 14, 1976. The district court also conducted a hearing on November 8, 1976, at which the Public Advocate argued plaintiffs' rights to a permanent injunction. Plaintiffs' motion for summary judgment as to the Fourth Count[3] of the complaint was filed December 6, 1976.

In an opinion filed March 31, 1977, the district court held that termination of federal financial participation in Shore Manor and the concomitant forced transfer of Medicaid residents to other nursing care facilities would deprive the residents of property interests cognizable under the due process clause of the Fifth Amendment. The district court also held that the process due the Medicaid patients at Shore Manor included a pretermination hearing at least coextensive with the hearings given an individual Medicaid recipient before reduction or cessation of his or her benefits pursuant to 45 C.F.R. § 205.10. In an order entered April 1, 1977, the district court granted summary judgment for plaintiffs on Count Four—the due process count—of their complaint and further enjoined HEW from terminating funding of Shore Manor until completion of the mandated administrative hearing.[4] The United States appealed from the district court's April 1, 1977, order.

---

**2.** HEW regulations require 30 days' notice before the termination of benefits to a nursing home. 45 C.F.R. § 249.10(b)(4)(i)(c) (1976). 45 C.F.R. § 249 (1976) has been recodified as 42 C.F.R. § 449 (1977), 42 Fed.Reg. 52,827 (Sept. 30, 1977). In this opinion all citations will be to 45 C.F.R. § 249 (1976).

**3.** This Count includes the following wording (13a):

"The provider of the services and the State are permitted to challenge the defendants' decision to terminate funding, yet the plaintiffs whose lives are directly affected by the defendants' decision have not been given the right to challenge the final decision. The plaintiffs have requested a hearing at the Federal level. Plaintiffs seek a hearing to challenge the need for termination of Federal funding. The refusal of the defendants to provide plaintiffs with notice and a hearing is in violation of the due process clause of the

Fifth Amendment to the United States Constitution."

**4.** The district court's order read in part (306–07a):

"It is on this 1st day of April, 1977 ORDERED that:

"(1) The motion for summary judgment be and the same is hereby granted for reasons expressed in the written opinion of the court; it is FURTHER ORDERED that:

"(2) The class patients shall be given the opportunity for evidentiary hearings before the Department of HEW on the decision of the defendants that Shore Manor does not comply with the conditions of provider participation in the Medicaid program and to terminate federal financial participation for services rendered to the class plaintiffs at the Shore Manor Nursing Home; and it is FURTHER ORDERED that:

## II.

Shore Manor's recertification as a qualified Medicaid provider bodes well for the Medicaid residents who desire to remain at the Home. HEW, in a post-argument memorandum to this court, expressly disclaimed any objection to federal Medicaid funding for Shore Manor during the period of recertification, January 31 through July 31, 1978. Appellants' Memorandum on the Question of Mootness served on the parties April 26, 1978.[5] With the advent of Shore Manor's compliance with federal standards, there is no present need for a hearing to be afforded the residents on the question of Shore Manor's eligibility to participate in Medicaid. Medicaid funds will not be cut off and the residents will not be compelled to relocate. In short, recertification of Shore Manor has obviated the district court's injunction. In light of this, we have no hesitation in holding that the dispute over prospective application of the district court's injunction is now moot.[6]

■ The usual disposition of a case mooted on appeal is for the appellate court to remand the case with directions to dismiss the action. *United States v. Munsingwear*, 340 U.S. 36, 39–40, 71 S.Ct. 104, 95 L.Ed. 36 (1951); 13 Wright, Miller & Cooper, Federal Practice & Procedure § 3533, at 292–94 (1976). *See e. g. Hart v. United Steelwork-*ers of America, 482 F.2d 282 (3d Cir. 1973). If the original action is not dismissed, the prior district court judgment would be accorded *res judicata* effect. *United States v. Munsingwear,* 340 U.S. at 40, 71 S.Ct. 104.

■ HEW attempts to resuscitate its appeal by asserting a right to recoup funds expended under an allegedly wrongful injunction. Under HEW's theory, an appellate court reversal on the merits of the district court's order forbidding summary termination of federal funding of Shore Manor is a prerequisite to its maintaining a recoupment action. The issue before the court is whether the prospect of an HEW suit for recoupment on the grounds of a wrongfully granted injunction requires this court to reach the merits of the injunction, rather than to divest the district court judgment of *res judicata* effect by remanding with directions to dismiss plaintiff's suit as moot.[7]

■ Were we to direct that plaintiffs' suit be dismissed as moot and thereby be deprived of *res judicata* effect, we assume HEW could bring its recoupment action and, in that forum, collaterally challenge the district court's injunction. However, the availability of a forum to collaterally challenge the district court's order does not

"(3) The hearing rights available to the class patients shall be at least coextensive with those available to Medicaid recipients at hearings before state agencies held pursuant to 45 C.F.R. 205.10; and it is FURTHER ORDERED that:

"(4) The defendants Joseph A. Califano, Jr. and William Toby are hereby enjoined from terminating federal financial participation for services rendered to the class plaintiffs at the Shore Manor Nursing Home until the conclusion of the administrative hearings."

5. Counsel for the plaintiff class has also advised this court by letter dated April 12, 1978, that they have no objection to deeming the case moot on the ground that there is no need for continuing the injunction. Letter to the court from Robert Westreich, Assistant Deputy Public Advocate, dated April 12, 1978.

6. Neither side in this case suggests that the mere conjecture that at some future date Shore Manor would lapse into noncompliance suffices to revive this case from mootness. Shore Manor is now in the position of any other qualified Medicaid provider whose prospect of future noncompliance does not constitute a situation "capable of repetition but evading review." *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911).

7. As a general matter, actions for damages are rarely mooted by the correction or cessation of allegedly unlawful conduct. 13 Wright, Miller & Cooper, Federal Practice & Procedure § 3533, at 272–73 (1976). *Cf. Memphis Light, Gas and Water Division v. Craft,* 436 U.S. 1, 7, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) (although injunctive relief from utility's termination of service had been mooted, customers' claim for actual and punitive damages saved case challenging termination procedures from the bar of mootness).

imply that HEW's direct appeal is moot. In the analogous context of preliminary injunction bonds,[8] even if the underlying dispute is mooted prior to appellate review, the prospect of a suit on the bond challenging the propriety of the injunction is sufficient to sustain the life of the appeal and to require the appellate court to review the merits of the preliminary injunction order. In *Liner v. Jafco, Inc.,* 375 U.S. 301, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964), the Supreme Court considered an appeal from a state court injunction barring union picketing at a building site. The owner of the building project had given a bond to indemnify the union in damages if the injunction were wrongfully sued out. The state courts granted a preliminary ex parte injunction and later, after a hearing, a permanent injunction. By the time the union obtained state appellate court review, the construction project had been completed. The Supreme Court held that although events had quieted the underlying labor dispute, the appeal was not mooted because of the union's stake in the bond. *Id.* at 305, 84 S.Ct. 391.

This court considered a similar situation in *American Bible Society v. Blount,* 446 F.2d 588 (3d Cir. 1971). There a group of mailers sought preliminary injunctions blocking the Post Office from instituting new regulations allocating the cost of sorting bulk mailings. The district court granted the preliminary injunctions on the condition the plaintiff-mailers posted security to cover any damages sustained by the Post Office in the event the preliminary injunctions were wrongfully granted. Before the court completed further proceedings, the mailers and the Post Office reached accord on a new plan for allocating bulk mailing costs. The plaintiffs moved to dismiss their suits and discharge the bonds. The Post Office opposed discharge of the bonds until

damages were assessed. The district court ruled that with the new agreement the plaintiffs' suits were now moot, the preliminary restraints would be vacated, and the bonds could be discharged. On appeal, this court noted that were the actions dismissed as moot, the Post Office would challenge the merits of the preliminary injunction in an independent action on the bond. Because judicial economy would not have been served by dismissing the suits as moot, we reached the merits. In so doing, we held that "[c]ourts have long recognized the principle that a case is not moot if there is a reasonable likelihood that the parties or those in privity with them will be involved in a suit on the same issues in the future." *id.* at 595.

We recognize that part of the rationale of *American Bible Society* was the policy of the Rule 65 security bond to protect defendants from the consequences of temporary restraining orders granted without opportunity for full deliberation of the merits of a dispute. *Id.* at 595 n.12. In this case, the district court had such an opportunity to assess the merits of the complaint and granted summary judgment and a permanent injunction. Whatever damages HEW incurred accrued *after,* not prior, to the district court's judgment on the merits. While this distinction may weaken the merits of HEW's claim for recoupment compared to a suit on a Rule 65(c) bond, the distinction should not affect the threshold issue of mootness on appeal. We choose to follow *Liner* and *American Bible Society* in this case and permit a defendant who asserts a colorable claim to compensation from a wrongfully granted permanent injunction whose prospective application has been mooted to appeal directly the merits of the injunction, rather than be remitted to a collateral challenge of the injunction in a recoupment action.[9]

8. Under Rule 65 of the Federal Rules of Civil Procedure, a plaintiff seeking a preliminary injunction or temporary restraining order must give a security bond for compensating the defendant in case the latter is subsequently found to have been wrongfully enjoined.

9. While we assume that HEW asserts a colorable claim to recoupment, we pretermit the issue of whether, as a matter of equity, merely by gaining appellate reversal of a permanent injunction the Government in this or other cases may obtain recoupment from recipients who

## III.

■■ The due process clause mandates procedural safeguards against Government deprivation of an individual's property interests. *Board of Regents v. Roth,* 408 U.S. 564, 576, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Protected property interests are not limited to ownership of real or personal property but extend to an individual's "legitimate claim of entitlement" to an acquired benefit. *Id.* at 577, 92 S.Ct. 2701. The due process clause does not create protected property interests. Rather, the Constitution protects property interests that are "created and . . . defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* Thus, the Supreme Court has explicitly recognized that the continued receipt of federal social welfare benefits for which individuals qualify under eligibility statutes or regulations is a property interest protected by the Fifth Amendment. *Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). *See Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Roth, supra,* 408 U.S. at 576, 92 S.Ct. 2701.

■ The threshold due process inquiry in this case is whether the termination of federal Medicaid funding to an unqualified provider of nursing care services deprives patients of entitlements to Government benefits within the meaning of the Fifth Amendment. The termination of federal funding of Shore Manor did not result in discontinuation of Government cash assistance for the residents' nursing care. However, with the decertification of Shore Manor, the state Medicaid agency was required to transfer all Medicaid residents to other qualified nursing homes as vacancies permitted.[10] Thus, the Medicaid patients were to be deprived of their continued residence at Shore Manor. HEW contends that the only due process entitlement of Medicaid patients is to receive Government assistance for nursing care rendered by qualified providers. The Shore Manor residents support the district court's determination that they were entitled, within the meaning of the due process clause, to continued occupancy at their particular home. Although the underlying property interest must derive its source from state or federal statute or rule, we must determine, as a matter of federal constitutional law, whether property interests so identified are protected as legitimate entitlements under the due process clause. *See Memphis Light, Gas and Water Division v. Craft,* 436 U.S. 1, 7, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978).

We look first to the Medicaid statute and implementing regulations as sources of possible property entitlements. The statute provides that persons eligible for Medicaid assistance may obtain medical care from any institution or person of their choosing qualified to provide the particular service. 42 U.S.C. § 1396a(a)(23); 45 C.F.R. § 249.20 (1976). Regulations promulgated under Medicaid provide that timely notice and an opportunity for a hearing be given any recipient "who is aggrieved by any agency action resulting in suspension, reduction, discontinuance or termination of assistance." 45 C.F.R. § 205.10(a)(5); *id.* § (4)(i). Regulations also limit the occasions when a nursing home patient may be transferred. A resident may be "transferred or discharged only for medical reasons or for his welfare or that of other patients, or for nonpayment for his stay." 45 C.F.R. § 249.-12(a)(1)(ii)(B)(4) (1976).

win an injunction enjoining the Government from terminating funding of a federal program. The limits of such a recoupment remedy are novel and are not squarely at issue on the instant record. In general, however, erroneously granted injunctions do not give rise to causes of action for consequential damages suffered by a defendant who complies with an injunction pending appeal. *See Campbell Soup*

*Co. v. Martin,* 202 F.2d 398, 399 n.1 (3d Cir. 1953). *But cf. Arkadelphia Co. v. St. Louis S.W. Ry. Co.,* 249 U.S. 134, 145, 39 S.Ct. 237, 63 L.Ed. 517 (1919).

10. After HEW cut off federal funds to Shore Manor in November 1976, the state assured uninterrupted financial support for the patients while they remained at Shore Manor pending relocation to other nursing homes.

■ The statutory provision permitting a recipient to obtain medical care from a freely selected provider and the regulations prescribing limited conditions for transferring a resident of a nursing home create a legitimate entitlement to continued residency at the home of one's choice absent specific cause for transfer. Administrators are not given the power to arbitrarily transfer for any reason a Medicaid patient from one nursing home to another. Where statutory benefits may be discontinued only on the occurrence of specified reasons or for cause, the existence of such reasons or cause may be established only after recipients of those benefits are given some form of hearing. The essence of due process is that legally generated expectations of continued receipt of Government benefits may not be summarily denied by arbitrary administrative action. Notice and an opportunity to be heard enable the recipient of Government benefits to retain their benefits by proving to the administrative agency that specified reasons or causes for termination of benefits have not occurred.

■ No one disputes that *if* a nursing care facility is determined to be an unqualified provider, then Medicaid patients may be transferred to other facilities. Such transfer would fall within the limited condition of the regulations permitting transfer "for the welfare" of the patient. Due process does not disturb this administrative rule. Due process requires only that the Medicaid nursing home patient be given an opportunity to participate in the administrative process to determine whether transfer is for his or her welfare. Because a decision to decertify a nursing home as an unqualified provider is tantamount to an order to transfer a patient for his welfare, Medicaid residents threatened with transfer are entitled to some form of hearing on the existence of the condition or cause for transfer—whether the home is a qualified provider and whether decertification is for the patients' welfare.[11]

■ Supreme Court decisions in different administrative contexts support our conclusion that a person who is legally entitled by statute, rule or understanding to continued receipt of Government benefits, except for specific reasons, is constitutionally entitled by the due process clause to some form of hearing as to the existence of the specified reasons for discontinuation of benefits. In *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the Court determined that, where contractual or statutory terms of appointment of public employees guaranteed continued employment absent "sufficient cause" for non-renewal, the employees had a property entitlement in continued employment and a due process right to a hearing on the existence of sufficient cause for non-renewal.[12]

---

11. It is noted that the Pennsylvania Department of Health Manual referred to in the second paragraph on page 296 of 586 F.2d of the dissenting opinion in *Town Court Nursing Center, Inc., et al., etc. v. Beal* (3d Cir. 1978), has no application to the New Jersey nursing home involved in this case. These findings of the district court are not clearly erroneous (A. 288):

"Shore Manor is the largest provider of skilled nursing and intermediate care services in New Jersey's Medicaid program. Its patients . . . are dependent on the continued availability of Medicaid benefits . . ."

*See also* Nursing Home Regulation in New Jersey: An Outline With Proposals for Reform, Part III, The Role of the Nursing Home Consumer, 1 Seton Hall Leg. Journal 20, 47–57 (1976).

12. In *Roth,* the university teacher's contract specified a particular expiration date and contained no provision for renewal. The contract did not, therefore, guarantee continued employment absent a specific cause for non-renewal. On those facts, the Court found that the teacher had no property right to require a due process hearing on the reasons for non-renewal of his contract. 408 U.S. at 578, 92 S.Ct. 2701.

In *Sindermann,* the Court held that, based on the complaint's allegations of a de facto tenure program, the plaintiff-college teacher should have been given an opportunity at trial to prove that he had an implied contractual right to continued employment unless sufficient cause were shown. Proof of such a property interest would have entitled the teacher to some form of hearing on the grounds for his non-retention. *Id.,* 408 U.S. at 599–603, 92 S.Ct. 2694.

In *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), six Justices concluded that where, by statute, a non-probationary federal employee could be discharged only for cause, the employee had a property interest under the due process clause and was entitled to some form of hearing as to the existence of cause.[13] In *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), the Court upheld, against a due process challenge, the transfer of a prisoner to less favorable confinement without affording him an opportunity to participate in a fact-finding hearing as to the cause of transfer. The Court relied on the fact that no state law or practice conditioned the power of prison officials to transfer prisoners on proof of misconduct or the occurrence of specific events.[14] *Id.* at 226–27, 96 S.Ct. 2532. In fact, the Court construed state law as vesting prison officials with discretion to transfer inmates for any or no reason. *Id.* at 228, 96 S.Ct. 2532. Finally, in *Memphis Light, Gas and Water Division v. Craft*, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978), the Court held that where, under state law, a public utility could not terminate service "at will" but only "for cause," customers had a "legitimate claim of entitlement" to continued service within the meaning of the due process clause. *Id.* at 7–11, 98 S.Ct. 1554.[15]

In summary, we believe that the due process clause extends some form of procedural protection to recipients of Government benefits if their benefits may be discontinued only for specific reasons prescribed by statute, rule or practice. In this case, federal statutes and regulations provide that a Medicaid resident in a nursing home has a property right in continued occupancy unless a specific condition occurs—that the home becomes unqualified to render care and the patients' welfare necessitates transfer.[16]

---

**13.** The relevant statutory provision in *Arnett* provided that an employee could be removed only for such cause as would promote efficiency of the civil service. The statute and accompanying regulations also specified the procedures to be followed in a discharge action. These procedures did not call for a trial-type hearing until after removal, but did require that the employee be given notice of the basis for his removal and that he be given an opportunity to answer the charges before the official vested with authority to order his removal. Three Justices reasoned that employees' due process property rights were conditioned by the procedures specified by statute and regulation. 416 U.S. at 151–55, 94 S.Ct. 1633 (opinion of Rehnquist, J.). The other six Justices disagreed and viewed the property entitlement as being created by the statutory assurance that an employee would be discharged only for cause. These Justices reasoned that the due process clause affords procedural protection independently of the statutory and regulatory procedures. *Id.* at 165–67, 94 S.Ct. 1633 (opinion of Powell, J.); *id.* at 177–80, 94 S.Ct. 1633 (opinion of White, J.); *id.* 206–11, 94 S.Ct. 1633 (opinion of Marshall, J., dissenting). Thus, a six-member majority of the Court determined that a statute which mandates continued employment absent specific cause creates a property right in continued employment and a constitutional right to some form of hearing to challenge the cause of discharge. *See Bishop v. Wood*, 426 U.S. 341, 345 n.8, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (employee dischargeable at will held to have no property interest, where-

as *Arnett* employee could only be discharged for cause and therefore had a property interest). The judgment in *Arnett* was based on the majority's conclusion that the procedures afforded by statute comported with the procedures independently required by the due process clause.

**14.** The *Meachum* Court considered the prisoner's claim to resist transfer to less favorable conditions to be of a liberty, not a property, interest. However, the Court examined state law as the source of the asserted liberty interest just as if the putative interest had been a property right. *Id.* at 226, 96 S.Ct. 2532.

**15.** Under state decisional law, a public utility could terminate service for nonpayment only if the bills were not a subject of a bona fide dispute. The *Craft* Court concluded that customers were entitled to continued utility service on condition of payment of all charges properly due. Thus, due process was held to require adequate notice of an established procedure for customers to dispute their bills without risk of immediate service cut-offs.

**16.** Given this conclusion, we deem it unnecessary to address an alternative argument for invoking the due process clause in this case, that transfer trauma suffered by dislocated nursing home patients reduces the financial benefits to which the patients are entitled under the Medicaid program. We believe that the Medicaid program guarantees an already insti-

## IV.

■ In determining what process is due in this case, we need only consider whether some opportunity should be given the Medicaid residents to object to decertification of Shore Manor prior to decertification and ensuing transfer.[17] If the district court were correct in holding that the procedures afforded the residents to contest deprivation of their property interests in continued occupancy violated due process, then the court's injunction barring the termination of federal funding was not erroneous and HEW would not be entitled to recoupment. The precise extent of the constitutionally mandated process does not affect HEW's claim for recoupment and, therefore, remains a moot issue now that HEW no longer threatens decertification of Shore Manor.

The Supreme Court has consistently held that "some kind of hearing is required at some time before a person is finally deprived of his property interest." *Wolff v. McDonnell*, 418 U.S. 539, 557–58, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 16, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978); *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The

only opportunity provided by regulation for the nursing home residents or their representatives to participate in the decision to relocate them involved consultation as to the means for transfer and relocation but not as to the cause for transfer. 45 C.F.R. § 249.12(a)(1)(ii)(A)(1)(iii) (1976).[18] In fact, a memorandum prepared by HEW for state agencies makes clear that, although planning should be undertaken to reduce the risks of transfer trauma, state agencies were not expected to consult the residents before decertifying nursing care facilities. Technical Assistance Memorandum from HEW to State and Area Agencies Administering Plans Under Titles III and VII of the Older Americans Act of 1965, as Amended February 19, 1975 (269–73a). It is undisputed that once a facility is decertified, relocation to other qualified providers is required to guarantee Medicaid patients continued receipt of benefits. Quite clearly, HEW's and the state agency's failure to provide Shore Manor residents with an opportunity to be heard on decertification effectively deprived them of an opportunity to challenge the "for cause" basis of their transfer. Thus, the Medicaid program as administered by HEW provides no hearing

---

tutionalized patient a property interest in continued occupancy, an interest distinct from the interest in continued eligibility for benefits. Dislocation may cause transfer trauma, but the denial of the patient's property interest in continued occupancy is unaffected by the extent of the loss or harm associated with this denial. *Cf. Meachum v. Fano, supra,* 427 U.S. at 224, 96 S.Ct. 2532 ("grievous loss" or "substantial adverse impact" are not alone sufficient to invoke the protections of the due process clause). We do not decide whether transfer trauma constitutes a deprivation of recipient's property interest in a given level of cash benefits.

**17.** We emphasize that on the facts of this case we are not faced with an emergency situation where substandard conditions in the nursing home pose an immediate, life-threatening, health or safety danger to residents which would justify summary transfer followed later by any necessary hearing. *See Case v. Weinberger,* 523 F.2d 602, 606–07 (2d Cir. 1975) (conditions which hampered fire evacuation may have been such an emergency situation justifying summary transfer). *See also* note 1 above.

In *Caton Ridge Nursing Home, Inc. v. Califano,* 447 F.Supp. 1222 (D.Md.1978), *appeal docketed,* No. 78–1290 (4th Cir., May 15, 1978), state officials decertified a Medicaid participating nursing home because of violations of the "Life Safety Code," involving fire hazards from overly narrow corridors and stairways. *Id.* at 1224. The district court dismissed a single patient's due process claim on the ground that in that situation the contributions of patients at a pre-transfer hearing would not be commensurate with the burdens of such a hearing. *Id.* at 1226. In this case, by contrast, the nursing home's violations involved deficient services rendered the patients, rather than structural defects. Consequently, the residents of Shore Manor could be expected to contribute relevant information at, for example, an informal hearing conducted at the home. *See* note 19 below.

**18.** "Except in the case of an emergency, the resident, his next of kin, attending physician, and the responsible agency, if any, are consulted at least 5 days in advance of the transfer or discharge of any resident, and casework services or other means are utilized to assure that adequate arrangements exist for meeting his needs through other resources."

for Medicaid nursing home residents prior to the final deprivation of their property interests in continued occupancy. For this reason, the Medicaid program's provisions for decertification and transfer do not satisfy the requirements of due process.

■ The district court did not err in enjoining termination of HEW funding for Shore Manor until the residents were given an opportunity to participate in the decision to decertify the Home. Consequently, HEW would not be entitled to recoup funds paid in compliance with the injunction. However, the court's injunction went further and prescribed particular procedures to be followed by HEW. Medicaid patients prior to relocation were to be given procedural rights coextensive with their rights under regulations to contest reduction or termination of individual cash benefits. In holding that the district court correctly required some form of hearing as to decertification, we wish to make clear that we do not necessarily approve of the district court's conclusion that due process required such extensive procedural rights. "[D]ue process is flexible and calls for such procedural protection as the particular situation demands." *Mathews v. Eldridge, supra,* 424 U.S. at 334, 96 S.Ct. at 902, quoting *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The extensiveness of hearings provided by regulation to an individual threatened with termination of all Medicaid benefits need not necessarily be equated to process due by the Fifth Amendment to a class of patients who wish to challenge a decision to decertify their nursing home.[19] We pretermit the issue of how extensive is the process due patients,

such as the plaintiffs here, until a case presents us with a continuing live dispute.

## V.

We will affirm paragraph (2) of the district court's order of April 1, 1977,[20] and remand the case to the district court with directions to dissolve the injunction as moot, in light of the recertification of Shore Manor Nursing Home as a qualified Medicaid provider.

ADAMS, Circuit Judge, concurring.

I concur in the decision of the Court for the reasons set forth in Judge Van Dusen's opinion and on the basis of my concurrence in the companion case, *Town Court Nursing Center, Inc. v. Beal,* 586 F.2d 280 (3d Cir. 1978).

SEITZ, Chief Judge, dissenting in part.

I concur, not without doubt, in the majority's determination that the appeal is not moot.

I dissent from the majority's determination that Medicaid residents must be accorded due process before an initial determination can be made by the Secretary to cease Medicaid payments to the provider. My reasoning is substantially reflected in my dissent filed today to the opinions in *Town Court Nursing Center, Inc., and Cooper et al., etc. v. Beal, etc., et al.,* 586 F.2d 280 (3d Cir. 1978); *Town Court Nursing Center, Inc. and Cooper et al., etc. v. Beal, etc., et al.,* 586 F.2d 280 (3d Cir. 1978).

ROSENN and JAMES HUNTER, III, Circuit Judges, join in this dissent.

---

**19.** *Mathews v. Eldridge, supra,* provides the framework for determining the "specific dictates of due process" in particular cases:

"[O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the

Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."
424 U.S. at 334–35, 96 S.Ct. at 903.
Applying this framework, an informal hearing conducted at the nursing home, supplemented by as many factual stipulations as feasible, may be the most expeditious way to secure the views of the residents and experts.

**20.** *See* note 3 above.

262

GARTH, Circuit Judge, dissenting.

I must respectfully dissent from the majority opinion in this case. In my opinion, this case is moot, and should be remanded to the district court with the direction that it be dismissed as moot. *See United States v. Munsingwear*, 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1951). Thus I believe that the court's opinion in this case is no more than an advisory opinion, which is, of course, proscribed under article III of the Constitution.

The duty of federal courts is "to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Mills v. Green*, 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895). Thus, for example, where an appeal is taken from an injunction which has since expired by its terms, it has been held that "no 'actual matters in controversy essential to the decision of the particular case before it,'" remain for a court to decide. *Oil Workers v. Missouri*, 361 U.S. 363, 367, 80 S.Ct. 391, 394, 4 L.Ed.2d 373 (1960), *quoting United States v. Alaska S.S. Co.*, 253 U.S. 113, 116, 40 S.Ct. 448, 64 L.Ed. 808 (1920). Similarly, where the dispute which gave rise to the district court's injunction has ended because of changed circumstances or the action of one of the parties, it would seem that there would no longer be an actual controversy for the court of appeals to decide. In such a case, an affirmance or reversal of the injunctive order could have no effect, since the injunction which gave rise to the appeal will itself have ceased to be effective.

That situation is precisely the one presented by this case. HEW has recertified Shore Manor and is currently providing Medicaid funding for services rendered to Medicaid patients. The patients who instituted the proceedings have attained their ultimate goal—Medicaid funding for Shore Manor—and no longer have any interest in this litigation.[1] The State plaintiff asserts no continuing interest in the case and did not even file a brief.[2] The injunction underlying this appeal enjoins HEW from terminating federal financial participation for services rendered to the patients' class under the Medicaid program until the patients are afforded pre-termination hearings.[3] That injunction has no present effect since federal funding is continuing and HEW asserts no present intention to seek decertification of Shore Manor. Any action by this court with respect to the injunction, which is the only order from which an appeal has been taken, would similarly be of no effect. It seems to me, therefore, that, since there is no present controversy and since any action by this court concerning the April 1, 1977 order would have no effect on the parties, this case must be deemed moot. *See Oil Workers v. Missouri, supra*. "To express an opinion upon the merits of the appellants' contention would be to ignore [a] basic limitation upon the duty and function of [this court], and to disregard principles of judicial administration long established and repeatedly followed." *Id.*, 361 U.S. at 367–68, 80 S.Ct. at 394 (footnote omitted).

The appellant HEW, however—and only HEW[4]—seeks to keep this case alive. HEW argues that it may in the future seek recoupment for Medicaid funds advanced to New Jersey pursuant to the district court's injunction, which HEW claims was erroneously granted. Thus, the agency contends that a true controversy still exists, and that this court must decide the issue of whether the injunction was or was not erroneously issued by the district court.

1. *See* Letters of March 17, March 21, April 12, May 30, and June 27, 1978 from Robert Westreich, Esq., Assistant Deputy Public Advocate of New Jersey, counsel for appellee class of patients.

2. *See* Letter of October 25, 1977 from the Attorney General of New Jersey, counsel for the State plaintiff.

3. *See* Dist.Ct. Order of April 1, 1977, App. at 306–07.

4. *See* text accompanying notes 1 and 2, *supra*.

The majority of this court agrees, and in my opinion has allowed HEW to bootstrap itself into a live controversy. The majority holds that this case is not moot,[5] even though HEW in seeking to vindicate its purported rights would be required to seek recoupment in a separate action, and even though in that action HEW would presumably be able to challenge collaterally the propriety of the district court's injunction, see *American Bible Society v. Blount*, 446 F.2d 588, 594–95 (3d Cir. 1971). In reaching this conclusion, the majority relies on *Liner v. Jafco, Inc.*, 375 U.S. 301, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964) and *American Bible Society v. Blount, supra.*

In those cases, the courts held that a case in which the underlying dispute had been settled was *not* moot, but in each case that result was reached because of plaintiff's potential liability on a preliminary injunction bond.

In *Liner v. Jafco*, for example, a state court had enjoined picketing in connection with a labor dispute at a building site. The injunction was challenged as in excess of the state courts' jurisdiction and in violation of the National Labor Relations Act. By the time the case reached the Supreme Court, construction at the site had been completed. The Court nonetheless held that the case was not moot in that the plaintiff (*i. e.* the employer who sought the injunction) still had a substantial interest in the judgment. That interest derived from an injunction bond, given by plaintiff, which undertook to indemnify the defendants if the injunction was "wrongfully" issued. 375 U.S. at 305, 84 S.Ct. 391. Thus,

since "the federal issues remain[ed] of operative importance to the parties," *id.* at 306, 84 S.Ct. at 394, the Court ruled that the case was one where decision on the merits could affect the rights of the litigants in the case before it.[6]

*American Bible Society v. Blount, supra,* involved a challenge to new postal regulations by certain fourth class mailers. In successfully seeking a preliminary injunction, plaintiffs gave a preliminary injunction bond. See Fed.R.Civ.P. 65(c). While the suit was pending, the Post Office promulgated new regulations to which the plaintiffs did not object. The district court subsequently dismissed the case as moot, and the defendant Post Office appealed. Holding that the case was *not* moot, this court stated:

We do not think this case is moot because if we dismiss this action the Post Office Department will in all likelihood institute suit against the sureties at some future time and, in any such action, the court will be faced with deciding the same issues that are in contention here. No liability can arise on an injunction bond unless there is a final judgment in favor of the party enjoined. Therefore, in any independent action on the bond, the court will of necessity judge the merits of plaintiffs' demand for a permanent injunction.

446 F.2d at 594–95 (footnote omitted). The court concluded that the parties' interest in the bond sufficiently assured their adversity, their concern with the outcome of the case, and their vigorous presentation of the relevant arguments.[7] *Id.* at 596.

---

**5.** The majority's introduction (Maj.Op. p. 253) to its discussion would lead to the belief that the majority concurs in my judgment that the *Klein* appeal is moot. If this were the case, of course, the appropriate disposition would be a remand to the district court with a direction that the case be dismissed. "Where it appears upon appeal that the controversy has become entirely moot, it is the duty of the appellate court to set aside the decree below and to remand the cause with directions to dismiss." *Duke Power Co. v. Greenwood Co.*, 299 U.S. 259, 267, 57 S.Ct. 202, 205, 81 L.Ed. 178 (1936).

It is clear, however, by its discussion of mootness (Maj.Op. pp. 255 256) and its

conclusion (*Id.* at p. 261: "we will *affirm* paragraph 2 of the district court's order . . ." (emphasis added)) that the majority has considered this appeal on its merits, an undertaking proscribed by the doctrine of mootness.

**6.** The Court was also impelled to this result because important federal labor policies implicated by the case might be frustrated by state court injunctions. That consideration, of course, does not apply in this case.

**7.** Also, *see Meyers v. Jay Street Connecting R.R.*, 288 F.2d 356 (2d Cir. 1961). In *Meyers* the court held that the case was not moot,

The majority has analogized this case to *Liner* and *American Bible Society* because HEW has asserted that it intends to seek recoupment. I believe, however, that those cases are inapposite here, for two reasons.

First, *Liner, American Bible Society*, and *Meyers* (*see* n.7 *supra*) all involved situations where a preliminary injunction had been granted and the plaintiff had given an injunction bond. In each case the injunction bond by its express terms provided that the defendant would be indemnified for damages incurred because of compliance with an erroneously issued injunction. Here, however, although a preliminary injunction was granted, no such bond was ever ordered or obtained. That, in my opinion, is a crucial distinction. It has generally been held that, at least in federal courts, "[w]ithout a bond no damages can be recovered at all. Without a bond for the payment of damages or other obligation of like effect, a party against whom an injunction wrongfully issues can recover nothing but costs, unless he can make out a case of malicious prosecution.[8] *It is only by reason of the bond, and upon the bond, that he can recover anything.*" *Meyers v. Block*, 120 U.S. 206, 211, 75 S.Ct. 525, 528, 30 L.Ed. 642 (1887) (emphasis added). Thus, in *Campbell Soup Co. v. Martin*, 202 F.2d 398, 399 n.1 (3d Cir. 1953), this court, faced with an argument similar to HEW's in this case—*viz*, that a case was not moot because the defendant had a cause of action against the plaintiff for damages suffered by reason of compliance with an injunction—stated that "[t]here is no such thing as a cause of action for damages incurred as a result of compliance with an injunction." *See generally,*

Note, *Interlocutory Injunctions and the Injunction Bond*, 73 Harv.L.Rev. 333 (1959).

I see no basis for distinguishing HEW's asserted claim for "recoupment" from a "cause of action for damages incurred as a result of compliance with an injunction." Thus, in my view, HEW would have no such claim for recoupment, unless a court were to depart from the general rule and hold that such a cause of action exists. While acknowledging this principle, and conceding that any "damages" that HEW might have suffered "accrued *after*, not prior, to the district court's judgment on the merits," Maj.Op. at 256, the majority nevertheless, without reference to any other precedent or authority, holds that the case is not moot. It so holds even though it is obvious that in this case—unlike the cases cited by the majority where there was a clear cause of action based on an injunction bond—there is no longer any aspect of this controversy which can be considered "live."[9] Here, unlike *American Bible Society*, there is no "reasonable likelihood that the parties . . . will be involved in a suit on the same issues in the future," 446 F.2d at 595, since it is clear that HEW can have no cause of action based on a wrongfully issued injunction. Indeed, were we to hold that the assertion of a possible claim for damages based on an erroneously granted injunction rendered this case not moot, it seems to me that we would pave the way for any defendant appealing from an injunctive order to bootstrap himself into court, even though the underlying controversy had ended, simply by asserting a presently non-existent cause of action for damages caused by compliance with an injunction, *see Campbell Soup Co. v. Martin, supra.*

although the order appealed from no longer restrained the appellants, since the preliminary injunction was conditioned on the giving of a bond to cover appellants' losses in the event that a permanent injunction was held to be improper. The court stated that its "decision on this appeal, therefore, will determine whether appellants can recover on that bond and whether appellees are liable upon it." *Id.* at 358.

I note in this regard that here, *any* decision we render will *not* determine whether HEW can recoup its payments or whether, if it can, the State will be liable. HEW calls upon us

only to decide one issue with respect to recoupment, *viz*, the propriety *vel non* of the injunction.

8. No claim of malicious prosecution is asserted in this case.

9. All parties, as well as the majority, concede that this case does not involve a situation "capable of repetition yet evading review," *see Southern Pac. Terminal Co. v. ICC,* 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911). Maj.Op. at 255 n.5.

I believe the cases cited by the majority are improperly relied on in this case for still another reason. Assuming that the possibility that a recoupment action exists in HEW's favor might be sufficient to save the case from mootness, the probability that HEW would be able to recover damages is far too remote and speculative to support a holding of non-mootness. In *American Bible Society, Liner,* and *Meyers* the defendant clearly had a viable cause of action based on the injunction bond. In each case the plaintiff had clearly suffered damages which would be recoverable on the bond. Here, however, it is far from clear—indeed it is unlikely—that HEW has a viable "recoupment" cause of action. Moreover, it is not at all clear that HEW has suffered any "damages" at all.

It is true that HEW was required to continue Medicaid funding to the State for Medicaid-covered services furnished by Shore Manor. However, HEW is required to reimburse the State, pursuant to a statutory formula, for payments made to Medicaid-eligible patients for services rendered by certified facilities. 42 U.S.C. § 1396b. Thus, had refunding been terminated for Shore Manor, and had the Medicaid patients been transferred to other, properly certified facilities, HEW would nevertheless have been required to provide its share of Medicaid funding for those patients. HEW, therefore, arguably has nothing to "recoup," since it merely was required to expend funds which under statute had to have been expended in any event had the injunction *not* been granted.

In this regard, this case is akin to *Japan Air Lines Co., Ltd. v. International Association of Machinists and Aerospace Workers,* 538 F.2d 46 (2d Cir. 1976). In *Japan Air Lines* a union, appealing from the issuance of a temporary restraining order which had long since expired, argued that the case was nevertheless *not* moot because it intended to sue on the bond given as security for the temporary restraining order. The court rejected the argument, reasoning that the union was unable to show any compensable harm suffered as a result of the restraint. *Meyers* and *American Bible Society* were distinguished on the ground that in those cases, unlike *Japan Air Lines,* there was clear, present injury, and likelihood of eventual suit was overwhelming. 538 F.2d at 50–51.

The same result should obtain *a fortiori* in this case. Here, not only is it unclear that any damage was suffered as a result of the injunction, but it is virtually certain that no cause of action exists. The remote possibility that the issue of the propriety *vel non* of the injunction may arise in subsequent litigation is "too slender a thread," *id.* at 51, on which to suspend a holding that this case is not moot. This court should not decide the "three-times removed" issue of, *if* HEW can bring a recoupment action, and *if* HEW suffered any injury because of compliance with the injunction, *whether* the district court's injunction was erroneously granted. That issue becomes ripe *only if* HEW brings a recoupment action, *if* it is first determined that such a cause of action exists, and *if* HEW is found to have suffered any injury.

In sum, in my opinion, since the controversy underlying the injunction appealed from has ended, this case has become moot. HEW's stated intention to assert a currently non-existent cause of action cannot serve to give life to an otherwise moot case. *See also Oil Workers v. Missouri, supra.* Contrary to the majority, I would remand to the district court with the direction that the entire case be dismissed as moot.